McNAUGHTON *v.* SMITH.

1. FRAUD—PROOF.
Fraud may be proved, like any other fact, by any facts and circumstances which satisfy the mind of its existence.

2. SAME—REQUESTS TO CHARGE.
A request to charge that the circumstances from which a presumption of fraud arises must be strong and irresistible, and such as to amount to clear proof,—that it will not be inferred from slight circumstances, — is improper, as requiring too high a degree of proof.

3. SAME—SALE OF STOCK—STATUTE OF FRAUDS.
Plaintiff sold to defendant C. certain shares of stock in a cement company, receiving part payment in cash, and security for the balance in a contract for the sale of certain shares of stock in a manufacturing company. Defendant S. represented that the manufacturing company's stock was worth from 75 cents to par, and that he would take it off plaintiff's hands if the purchaser should fail to pay. The purchaser failed to pay, and the manufacturing company became insolvent. Plaintiff sued defendants for fraudulently converting his cement stock. *Held,* that a request to charge that defendant S. could not be held liable, for the reason that his promise was not in writing, was properly refused, as plaintiff did not seek to recover for a breach of the agreement, but claimed that the promise was made fraudulently, and in pursuance of a conspiracy for the purpose of inducing him to part with his cement stock.

4. SAME—FALSE REPRESENTATIONS—EVIDENCE.
Testimony that defendant, who was president of a manufacturing company, said in May that he would not take its stock at any price, that in the summer following the company went into the hands of a trustee, that at that time there was a mortgage on its real estate with one year's interest unpaid, and a mortgage on its personal property to secure indorsements of its paper at the bank, that at the time of the trial the property had been sold, and no stockholder paid anything, tends to show that a statement made by defendant in February previous, that its stock was worth from 75 cents to par, was false.

5. Same—Arrest of Codefendant.

> In an action for fraud in the sale of certain shares of stock, the contention that it was error to permit plaintiff to show that, after the alleged fraudulent sale was fully consummated, one of the defendants became financially embarrassed, and was sent to State's prison on a criminal charge, is without force, where such testimony was given, without objection, by the complaining defendant.

6. Trial—Incompetent Testimony—Curing Error.

> Error in the admission of testimony is cured by subsequently striking it out, and directing the jury to disregard it, where no further allusion is made to it, and no request for further instructions thereon.

Error to Hillsdale; Chester, J. Submitted November 18, 1903. (Docket No. 133.) Decided April 26, 1904.

Case by Kent McNaughton against George N. Smith, impleaded with Albert B. Cummins, for the fraudulent conversion of certain corporate stock. From a judgment for plaintiff, defendant brings error. Affirmed.

*F. M. Hall* and *F. A. Lyon*, for appellant.

*Lehmann & Riggs*, for appellee.

Moore, C. J. It is the claim of plaintiff that George N. Smith, Albert B. Cummins, and George M. Swaney entered into a conspiracy to defraud him of his stock in the Omega Portland Cement Company, and that, by means of fraudulent statements made by them to Delmar McNaughton, his half-brother and agent, they obtained possession of said stock, and fraudulently converted it. This suit was brought to recover the value of said stock. From a judgment in favor of the plaintiff, the defendant Smith has brought the case here by writ of error. The record is quite a long one. There are 58 assignments of error. So many of them relate to the charge of the judge, and to his refusal to give requests to charge, that it is best to give the substance of his charge to the jury, which was as follows:

136 Mich.—24.

" The plaintiff claims that in February, 1901, he offered for sale 250 shares of the Omega Portland Cement stock; the plaintiff residing in Detroit. His brother, Dell Mc-Naughton, was in business here, and he sent this stock to his brother to dispose of, because the cement plant was located in this county, and some of the directors and a good many stockholders resided in this county. Mr. Dell McNaughton advertised the stock for sale. Mr. Mc-Naughton claims that the defendant Smith came to his store and asked about the stock; that he told him that the stock belonged to his brother, and his brother wanted to get cash out of it, and that he could not sell it for less than 90 cents on the dollar in cash; that he had some conversation with Mr. Smith regarding it, and Mr. Smith said he would not pay that, and he one day afterwards said something to him about getting a purchaser; that one day Mr. Smith came into the store and told him that he guessed he had found a purchaser for him, which turned out to be Mr. Cummins, or at least Mr. Cummins was with him; that they then had a talk about this stock, Mr. McNaughton telling him, in substance, that this stock was for sale, and advertised for 90 cents on the dollar; that Mr. Cummins substantially agreed with him that he was to take it, and that Mr. McNaughton was to come over to the store soon after that and close up the deal.

" That, shortly after that, Mr. McNaughton went over to Mr. Cummins' store, and there they had a talk, and that Mr. Cummins then had the plan of giving to Mr. Mc-Naughton $800 in money, and a contract which he claimed he had entered into with his brother-in-law, Mr. Swaney, for the sale of certain Hillsdale Manufacturing stock; that that contract amounted to $1,625, and it called for the sale of $2,500 of the Hillsdale Manufacturing stock. It was claimed that Mr. Swaney had paid to Mr. Cummins at that time $50 on that contract; that he then wanted to turn that over to Mr. McNaughton as security for the balance that would be due on this stock at 90 cents, which was $1,450, I think; that, after some conversation there, Mr. McNaughton asked for time, and then Mr. Cummins told him that Mr. Swaney wanted to take the train,—that he could not wait very long,—but, after some conversation, he was given, perhaps, a half hour. Mr. Dell McNaughton claims that he went to the Hillsdale Savings Bank, and saw some one there; went down to the First National Bank, and saw some one there regard-

ing it. He then started back to Mr. Cummins, and Mr. McNaughton says it was in his mind then to tell Mr. Cummins that he would not make the trade or the sale as Mr. Cummins had talked. About this time he saw Mr. Smith. He claims that Mr. Smith then represented to him that he (Smith) had $4,000 in this company, and that it was worth par. He then told him about this contract,— what Mr. Cummins wanted to do; that Mr. Cummins offered to give him $800 in money, and turn out this contract, which was to be performed on or before the 2d day of March following; and that Mr. Smith then said to him, if he made that deal, that he (Smith) would take the stock off of his hands, providing Mr. Swaney did not perform the contract or Mr. Cummins did not redeem it; claiming to him that this Hillsdale Manufacturing stock was worth from 75 cents to a dollar on a share, but that he would not sell his for less than a dollar, or that, in substance, he thought it was worth a dollar. He claims at this time that Mr. Smith went in with him and looked over this contract, and that he relied upon the statements made there by Mr. Smith at that time that this contract was perfectly good. It is also in evidence here that Mr. Dell McNaughton thought Mr. Cummins was financially good; but he claims he relied upon the statement of both of these men that this contract should be performed, and that Mr. Smith said that the stock was worth from 75 cents to a dollar, and that, if he didn't take it, he would take it off from his hands; that, after he had made this deal, he communicated it to Kent McNaughton, in Detroit, and by telephone he got back from Kent McNaughton some inquiries regarding it, and also questioning the sale; and that, after some conversation or a letter from Mr. Kent McNaughton, he went and saw Mr. Cummins, and Mr. Cummins guaranteed that this contract would be performed. I think it is also in evidence here that Mr. Dell McNaughton at that time understood and believed that Mr. Smith was also financially responsible and reliable.

"That he had more or less conversation over the phone and by letter with his brother in Detroit regarding the situation here, until the 2d day of March,—the brother insisting that he could not get good reports regarding it, that he was not satisfied with it,—and that Dell McNaughton would go and have a talk with Mr. Smith, and also with Mr. Cummins, and then he would write his brother

or telephone him, assuring him that everything would be all right; that this ran along until the time of the contract was up, March 2d, and then that Dell McNaughton made what efforts he could to secure his money on this contract. I might state that, at the time this contract was made, there was another contract signed, whereby Mr. Dell McNaughton agreed to pay back to Mr. Cummins, when Mr. Swaney paid him, the difference between the amount which was due Mr. McNaughton and what Mr. McNaughton should get, and I think the evidence shows that that would be $125.

"The plaintiff claims that he was defrauded out of this stock; that is, the difference between $800, the amount that he received, and the market value, which he claims was 90 cents, for the Omega stock. He claims that the amount he lost by this deal was $1,450. He claims that the evidence shows that at this time this Hillsdale Manufacturing stock was substantially worthless,—was not worth 75 cents to a dollar,—and that the statements made by Mr. Cummins and Mr. Smith were false; that they were made for the purpose of cheating him out of his stock and getting it from him. He claims that the circumstances show, at this time when this contract was delivered, and the check for $800 was given to him, which check he sent to his brother in Detroit—that the evidence shows that Mr. Smith and Mr. Cummins gave a note to the bank for $800 to meet that check. He claims that is an element of evidence here bearing upon the question as to whether or not Mr. Smith had any knowledge or any understanding with Mr. Cummins about purchasing this stock.

"It is also claimed on the part of the plaintiff that his agent, Dell McNaughton, knew nothing about Mr. Smith's having this stock until about the time Mr. Riggs came here; that Mr. Riggs came here some time in May; that he saw Mr. Cummins regarding this stock,—about his taking back the $800 and this contract, and surrendering up the Omega stock; that he was informed by Mr. Cummins, or learned, that Mr. Cummins did not have the stock, and he and Mr. Cummins together went to Mr. Smith's house and saw him; that they had a talk about it. Mr. Riggs claims that he then tendered back to Mr. Smith the $800 in money, the contract for the sale or purchase— whatever it may be termed—of this Hillsdale Manufacturing stock, and the Hillsdale Manufacturing stock; that Mr. Smith refused to take it, but said to him he would see him

later, if he made up his mind to turn the stock back; that he came back down to the hotel and waited for him, and he did not come, and then he went to Mr. Smith's place of business, and Mr. Smith refused to turn back the stock, and take the $800 and the contract and the Hillsdale Manufacturing stock.

"It is claimed here that the evidence establishes that Mr. Smith and Mr. Cummins had some conversation about this stock before Mr. McNaughton sold it to him, and it was understood by them that there was a scheme on foot between Mr. Smith and Mr. Cummins that Mr. Cummins should obtain this stock for Mr. Smith in this way, and that Mr. Smith was to do his part, and that in doing his part he made the representations which the plaintiff claims he did make regarding the Hillsdale Manufacturing stock. The plaintiff claims those representations were false, and that he relied upon them and parted with his stock, and that he has been defrauded.

"The defendant insists that he did not enter into any scheme with Mr. Cummins to get this stock away from Mr. McNaughton. He denies that there was ever any intent on his part of defrauding anybody. He denies that he told anything to Mr. McNaughton that was not true, or anything he did not believe to be true; and he insists that he bought this stock in good faith from Mr. Cummins, paying him 75 cents on the dollar, which he claims was a reasonable price, and all it was worth at that time; at least, it was a reasonable price for him to pay for it. He claims he did not make any false statements to Mr. McNaughton about the value or the amount that he had, or what he claimed it was worth. He insists he believed the stock was good, and would pay a fair income on the amount of stock that was issued by the company, upon the business they had, with proper management; and he insists that the evidence in this case is not such as would justify the jury in finding that he was guilty of any fraud or deceit.

"I might state at the outset, gentlemen, that it is necessary for the plaintiff to make a tender. It was necessary for the plaintiff to make a tender back to the defendants here of the $800 in money and the Hillsdale Manufacturing Company stock and the contract, in order that he might bring this suit. You have heard the evidence on that subject, as to whether he did or did not, and it is for you to determine whether he did, at the time Mr. Riggs was here,

make a tender to Mr. Cummins, and also to Mr. Smith, as claimed by him; and, if he did not make a tender at that time, as claimed by the plaintiff, the plaintiff cannot recover, unless you further find that Mr. Smith refused absolutely to receive them under any circumstances, whether he produced them there or not. It is claimed on the part of the plaintiff that they did produce those papers; but, if Mr. Smith at that time refused to accept them, then he would be relieved from producing them in his sight, but, otherwise from that, it was his duty to make the tender.

" Then, if you find that the plaintiff did make the tender, you come to the question of whether this action has been seasonably brought. Upon this question, you are instructed that, where one claims to have been induced to enter into a contract by fraud, it is his duty, upon the discovery that he has been defrauded, to rescind the contract within a reasonable length of time, by tendering back what he has received and demanding that of which he claims to have been defrauded; and the party defrauded is bound to use reasonable diligence and to use no avoidable delay in complaining.

" As I said, the plaintiff must have acted promptly to rescind; and on this point I charge you, gentlemen, as follows: It is a rule of law that, in cases where the plaintiff intends to rely upon fraud, that the rescission should be prompt and unequivocal; but each case depends upon its own circumstances and environments. Here the plaintiff claims that the evidence shows that the same men who did perpetrate the fraud, if any was perpetrated, continued to use strong arguments and persuasions on the brother, Dell, continuing their deception after the transaction; claiming that the man Swaney would soon carry out his contract; claiming at other times that the defendant Cummins would take the stock; claiming that they would bring purchasers to him up from Hudson and other places; and this information being continually forwarded to Detroit to the plaintiff. Then, if you find that it was by reason of the acts of the defendants themselves, working through Dell McNaughton, the agent of the plaintiff, assuring the plaintiff that all would be well and come out right, lulling him into a feeling of security and safety, and that it had that effect upon him, in such case the person defrauded would not be called upon to make so prompt and decisive a rescission as might be the case where the facts were different. If you find that the plaintiff, upon

discovering the fraud, acted in a reasonably prompt manner in tendering back this money and rescinding the whole transaction and beginning suit, you will take nothing against him because of the period or the lapse of time between the transaction and the commencement of suit. In other words, gentlemen, it is a question for you, under all the circumstances here, to say whether the rescission of the plaintiff, through Riggs, of the agreement, was sufficiently prompt to satisfy the law. The plaintiff claims that he did not fully discover the fraud which had been perpetrated upon him through the conduct of these defendants until the visit of Mr. Riggs to Mr. Smith, and that, as soon as he discovered the fraud, he at once authorized said attorney to tender back all he had received through the transaction, and demand back his stock. If you find that to be a fact, then I charge you that the defendants cannot claim any benefit because the contract was not more promptly rescinded, if you find that through their conduct the full knowledge of the fraud was kept from the plaintiff.

"Then, gentlemen, you come to the question of fraud. If, under the evidence in this case, you find there was a scheme or an agreement or an understanding or a co-operation between Mr. Smith and Mr. Cummins to deceive this plaintiff, through the plaintiff's agent, and fraudulently obtain from him this stock, and they did, and he relied upon those representations which were made, which you find to be false, and they did defraud him, then the plaintiff would be entitled to recover.

"Now, I have said if they did deceive him. If you find that the claim made here by the plaintiff, that Mr. Smith introduced Mr. Cummins to him, and that Mr. Cummins had a talk with him whereby he agreed to purchase this stock for 90 cents cash, and then he went over there, and Mr. Cummins had an arrangement whereby he would pay him $800, and turn out to him as security this contract, and Mr. McNaughton made inquiries, or, whether he did or not, but anyhow he came to the conclusion that he would not take it, and he saw Mr. Smith, and Mr. Smith, as a part of the arrangement, said to him, for the purpose of inducing him to part with his stock and take this contract: 'Why, I will take that stock off your hands at that price. It is perfectly good. This stock is worth from 75 cents to a dollar,'—and you find that those things were false, and that he did not intend to take this

stock off from his hands, then you will find against the defendants and for the plaintiff upon the question of fraud. On the other hand, if Mr. Smith made the representations independent of Mr. Cummins, or if he made them believing them to be true, as to the value of this stock, or if he made them, and was not co-operating with Cummins to cheat, wrong, or defraud plaintiff, then the plaintiff cannot recover. Or, if you find that plaintiff has not been defrauded in any way, of course he could not recover.

" The defendant Smith, here, I think, has announced through his counsel here that they make no defense for Mr. Cummins. He neither admits nor denies, so far as Mr. Cummins is concerned, anything one way or the other,— whether those things are true as to Mr. Cummins or not; and the position he takes on this question is that, even if Mr. Cummins did get the ownership of this Omega stock through fraud, he (Smith) is not a party to it, and cannot be held accountable. But this is for you to say, under all the facts and circumstances developed here, whether or not the defendant Smith was connected with this fraud, if you find there was a fraud perpetrated on the plaintiff; and if you find that Mr. Smith co-operated with the defendant Cummins in this fraud, knowing that Cummins was engaged in a fraudulent scheme of the character charged, and the defendant Smith aided Cummins by helping to persuade the plaintiff's agent into making the deal with Cummins, then the defendant Smith would be equally liable with Mr. Cummins for the results, regardless of what Mr. Smith may have paid Mr. Cummins for the stock that he got.

" You are not called upon to figure out who got the most out of this transaction, Smith or Cummins. It is enough for you to decide whether one or both participated. The law holds the person responsible who fraudulently contributes to the result; and it will not do for Mr. Smith, here, to claim that he bought and paid for this stock from Mr. Cummins, if you find that he aided Mr. Cummins in defrauding the plaintiff out of it. In other words, if Mr. Cummins did buy this stock of Mr. McNaughton, and it now shows up in Mr. Smith's hands, as the result of a sale, legitimate enough in its character, from Mr. Cummins to Mr. Smith, and you find that Mr. Smith knew the manner and means by which Mr. Cummins was obtaining this stock, and he (Smith) helped it along by the use of his influence over Mr. McNaughton, and what he said and did

in influencing Mr. McNaughton was not true, but was calculated to defraud him out of this stock, then Mr. Smith must be held responsible for this action, because, under the law, it was through him that the loss came to the plaintiff.

"I have already stated to you, gentlemen, that if there was not any co-operation here, or any conspiracy or scheme to defraud, or if there was no fraud perpetrated, and it was an innocent transaction so far as Mr. Smith was concerned, then there could be no recovery against Mr. Smith.

"Some evidence has been introduced tending to show that defendant Smith made statements to Dell McNaughton, and promised him, if Mr. Swaney did not carry out the written contract of purchase of the Hillsdale Manufacturing stock, and if Cummins did not redeem the stock, he (Smith) would buy the Hillsdale Manufacturing stock at the price at which Swaney was to have it. You are instructed that no recovery can be had against Mr. Smith because of the mere promise to purchase if Swaney failed to carry out the written contract. Such a promise to purchase would be void under the statute of frauds, and cannot be enforced. But if you find that such promises were made by Smith, and they were false, and made by him for the purpose of profiting thereby and cheating the plaintiff, and that it was a part of a scheme between him and Cummins and Swaney, or any two of them, to defraud plaintiff, then he (Smith) would not be relieved from his statements by virtue of the statute of frauds.

"Fraud cannot be presumed, gentlemen, in a case of this kind. It must be established by proof. It must be proof such as naturally leads your mind to the conclusion that there was fraud committed.

"The burden of proof is upon the plaintiff in this case. He must establish the claim which he asserts here by a preponderance of the evidence,—that is, there must be more evidence in favor of the claim that he asserts than there is against it; and the burden of proof in establishing fraud, as I said a moment ago, is upon the plaintiff. * * *

"The credit of witnesses is for you. Give to each witness such credit as you think he, under all the circumstances, is entitled to, having regard for the appearance of the witness upon the stand,—whether he appears candid or not; desirous of telling the truth or not; whether he has any interest in the result that would bias his testi-

mony; or whether he has any prejudice, or whether there is any influence brought to bear upon him that would change his testimony from that which would be right. All of these things are to be taken into consideration by you in determining the weight and credit that you should give to the testimony of a witness. * * *

"I have given you these instructions with reference to both of these defendants. If you find there was fraud upon the part of Mr. Cummins, and not upon the part of Mr. Smith, you can bring your verdict in against Mr. Cummins. In other words, if you find that both of these men participated in this fraud, then you will bring judgment against both of them, if you find for the plaintiff. If you find that only one of them participated in the fraud, you may bring a judgment against the one that you find is guilty of fraud in this transaction. If you find there was no fraud upon the part of either one of them, then your verdict will be for the defendants. If you find that one of them did not participate, but the other did, you will find a verdict against one of them, and not against the other."

The most important question presented by the assignments of error is whether the plaintiff made a case which should have been permitted to go to the jury. It is the claim of defendant that, giving the most favorable version to the testimony, there was no case made against the defendant Smith. To use the language of counsel:

"It is the theory of the defendant, *first*, that no fraud was practiced upon the plaintiff; and, *second*, that the defendant Smith had nothing to do with bringing about the deal between defendant Cummins and the plaintiff in such a way as would connect him legally with any of the transactions, or make him legally responsible for the results."

The question of how fraud may be proven has been before the court repeatedly. In *Ferris* v. *McQueen*, 94 Mich. 367 (54 N. W. 164), Justice Long, speaking for the court, said:

"In speaking of the other claims of fraud made by counsel for defendant, the court stated to the jury:

"'Fraud must be proved, and must not be inferred from slight

circumstances. Fraud may be proved, however, by circumstantial evidence as well as positive proof. Where fraud is charged, express proof is not required. It may be inferred from strong presumptive circumstances. Fraud will not be presumed upon slight circumstances or mere suspicion, but the circumstances must be such as to amount to clear proof, before a party can be held liable for fraud; and it must be consistent with the acts of fraud charged, and inconsistent with honesty and good faith.'

"It is claimed that this was error; that it was misleading to the jury; that the court was in error in stating that 'fraud must be proved, and must not be inferred from slight circumstances;' and, again, in saying that 'it may be inferred from strong presumptive circumstances.'

"In *O'Donnell* v. *Segar*, 25 Mich. 378, it appears that the jury were told by the trial court that 'they could not infer fraud, and that it could not rest upon implication.' It was said by this court:

" 'We know of no such rule of evidence in reference to the question of fraud. It is, like any other fact, to be proved by any facts and circumstances which satisfy the mind of its existence, and may be, and generally is, when found, inferred from circumstances, and cannot often be proved in any other way.'

"The court in the present case, however, told the jury that fraud could 'be proved by circumstantial evidence as well as positive proof;' and yet a limitation was placed upon this by adding that these facts and circumstances must not be slight, and the inference could only be drawn from strong presumptive circumstances, which must amount to clear proof. The rule is that fraud may be proved, like any other fact, by facts and circumstances which satisfy the mind of its existence, and it is a question for the jury when there is any evidence to warrant the finding. As was held in *Freedman* v. *Campfield*, 92 Mich. 118 (52 N. W. 630), when there is a *scintilla* of evidence the verdict will not be disturbed. We think the court was not justified in the use of this language, and that the rule laid down is not upheld by the cases.

"In *Watkins* v. *Wallace*, 19 Mich. 77, Mr. Justice Campbell, speaking of the charge in that case, says:

" 'We think, however, that, in charging the jury concerning the proof of fraud, the language used had a tendency to mislead the jury into a belief that more stringent proof was necessary than the law requires. The judge charged them that "fraud will not be

presumed from slight circumstances; the proof must be clear and conclusive." '

"This was held error, and the case reversed. It is a little difficult to see any distinction between such a charge and the one given here. The court did not say that the proof must be conclusive, but did say that it must be clear, and, in effect, that it could not be inferred except from strong presumptive circumstances. As in *Watkins* v. *Wallace, supra,* it may be said that:

"'It might have misled the jury as to the amount and quality of proof required. * * * No such rigid rule prevails in any civil case. Common sense teaches every one to be cautious in arriving at conclusions which are prejudicial to character and honesty; but, if the testimony produces a rational belief, a civil jury cannot be required to discard it because it is not conclusively established.'

"We think the court was in error in this part of the charge."

This case is cited with approval in *Gumberg* v. *Treusch,* 103 Mich. 543 (61 N. W. 872), and the court added:

"Proof of facts and circumstances is sufficiently clear if it creates a belief that a fraud has been perpetrated."

In *Morgan* v. *Andrews,* 107 Mich. 33 (64 N. W. 869), Justice LONG, again speaking for the court, said:

"Fraud is seldom shown by direct proof, but by facts and circumstances taken together, and the inferences to be drawn therefrom. *Ross* v. *Miner,* 67 Mich. 412 (35 N. W. 60). The rule is that fraud may be proved, the same as any other fact, by facts and circumstances which satisfy the mind, and it is a question for the jury when there is any evidence to warrant the finding. *Freedman* v. *Campfield,* 92 Mich. 118 (52 N. W. 630)."

The record is a long one. It would profit no one to recite all it contains bearing upon the questions of fraud and Mr. Smith's relation to it. A careful reading of the record, and especially Mr. Smith's cross-examination, convinces us there was abundant evidence tending to show fraud, and that Mr. Smith participated in it, which, if believed, justified the verdict of the jury.

A good many of the requests to charge on the part of the defendant state the proposition that Mr. Smith cannot be

held liable for the reason that his promise to take the stock was not in writing, and therefore was void under the statute of frauds. A good many pages of the briefs of counsel are devoted to arguing this proposition. We think this question is not involved in the case. Plaintiff does not seek to recover for a breach of the agreement, but claims the promises were made in pursuance of a conspiracy and fraudulently, for the purpose of obtaining from him his stock. We think the judge properly charged the jury upon this feature of the case.

Another claim made by counsel, stated in their own language, is:

"We contend that nowhere in the record is there any testimony either negativing or tending to negative the statements claimed to have been made either by Mr. Cummins or Mr. Smith. There is not a *scintilla* of evidence in the record that shows that one single statement made by either of these parties, as a matter of fact, was not absolutely true. All statements which were statements of fact stand either corroborated by the plaintiff's testimony, or not negatived. The testimony nowhere shows that any representation of facts made by either Cummins or Smith was not absolutely true."

On the part of the plaintiff it is said there was no claim in the trial court that the representations were not shown to be untrue, but the claim was that no such representations were made. The record would seem to sustain this contention, for, though defendant presented 18 different requests to charge, no suggestion is made in any of them that the statements plaintiff claims were made were not negatived. We do not, however, need to pass upon the question of whether this claim was made in the court below. It should be borne in mind that, at the time of this transaction, Mr. Smith was president of the company, and Mr. Cummins was its secretary and manager. They ought to have known, and doubtless did know, of the condition of the company. The testimony is that as soon as the plaintiff, in Detroit, learned about his brother's taking this stock, he notified him it was valueless, and the

brother, in turn, talked with Cummins and Smith about it. The trade was made the 18th of February, 1901. Mr. Riggs testified that in the fore part of May, 1901, he had a talk with Mr. Smith, in which he—

"Asked him if he was ready to turn over the stock at that time. He said no, he couldn't turn it over then; that his wife was out of town, and he had turned it over to her. He said he got it cheap, and made her a present of it. During the conversation at Mr. Smith's house, when I was telling them that this was a fraud,—that this stock wasn't any good,—Mr. Smith wanted to know how I made that out. I told him from Dun's report, and from reports that I had learned about it; and I said, 'If it is of any value, will you take it?' He said no, he wouldn't take it himself at any price."

The record also shows the company passed into the hands of a trustee in the summer of 1901, and at that time there was a mortgage on its real estate, on which one year's interest was unpaid. There was a chattel mortgage of $2,000, running to Smith and Cummins, to secure them for indorsing the company's paper at the bank. At the time of the trial the property had been sold, and no stockholder had been paid anything, and there was no reason to suppose ever would be. We think it cannot be said there was no evidence that the company was not paying dividends, and was not paying its debts as promptly as any man in town, and that the stock was not worth from 75 cents to par.

It is insisted the court erred in not giving the following requests:

"Fraud cannot be presumed, but must be proved, and the burden of proof is on him who complains of it. The law presumes fairness, rather than fraud, and the circumstances must be such as amount to clear proof before the party can be held liable in fraud. The circumstances from which a presumption of fraud arises must be strong and irresistible, to allow the plaintiff to recover. The presumptions are against fraud, and it may never be held proved by circumstances that are merely ambiguous. The inference to be drawn from circumstances must not only be

consistent with the acts of fraud charged, but inconsistent with honesty and good faith in the transaction.

"Fraud is never presumed, nor will it be inferred from slight circumstances. It is not enough to establish fraud to show a large number of circumstances tending in that direction. It is only when that tendency is so strong that it generates full belief that it can be regarded as evidence, and it is not until that evidence has become so convincing as to amount to positive proof that it should be considered as established."

These requests assumed that more proof is required to establish fraud than the decisions of this court have said is required. We have already quoted enough from the opinions in *Ferris* v. *McQueen, supra,* and *Morgan* v. *Andrews, supra,* to show it was not error to refuse these requests. The judge charged upon this subject as follows:

"Fraud cannot be presumed, gentlemen, in a case of this kind. It must be established by proof. It must be proof such as naturally leads your mind to the conclusion that there was fraud committed.

"The burden of proof is upon the plaintiff in this case. He must establish the claim which he asserts here by a preponderance of the evidence,—that is, there must be more evidence in favor of the claim that he asserts than there is against it; and the burden of proof in establishing fraud, as I said a moment ago, is upon the plaintiff."

This is in accord with the opinions quoted.

Counsel say it was error to allow plaintiff—

"To show that, after this transaction was fully consummated, the defendant Cummins got into financial embarrassment, and was sent to Jackson upon a criminal charge; that, after this misfortune came upon defendant Cummins, the Hillsdale Manufacturing Company's property was placed in the hands of a trustee, to be closed out for the purpose of settling up its affairs and paying up its indebtedness; and the plaintiff's counsel was permitted, against the objection of counsel for defendant Smith, to show by the cross-examination of the witness William Prideaux the condition of this property of the Hillsdale Manufacturing Company at the time it was being closed

out by him as such trustee, and what this property sold for."

It is an answer to the first part of this contention that Mr. Smith himself testified, without objection, that:

"I was in Hillsdale when Cummins was arrested. I did not see him frequently while he was under arrest. I never was over there but once. I never saw him but once. He sent over word for me to come, and I went over. The first and second times the sheriff was not there, and the third time I saw him. I had to go over three times before I saw him. From reports, Mr. Swaney is over to Jackson six years, and Cummins five years."

As to the last part of this contention, we think the testimony was competent, as bearing upon the value of the stock.

Complaint is made because Mr. Riggs was allowed to testify what Mr. Cummins, who was then in State's prison, told him a year after the transaction, which was as follows:

"He [Cummins] said it was George N. Smith's transaction. He said he was a stool pigeon. He said he held the stock just long enough for Dell to get out of the store, and that he got practically nothing out of it. He told us at that time that he would be willing to have his deposition taken, and to testify to the statements he was making to us."

When this testimony was offered, the judge was of the opinion the testimony was competent as against Mr. Cummins, if not against Mr. Smith, and admitted it. The next day the judge, upon his own motion, struck out the testimony, and directed the jury they were not to consider it for any purpose. No further allusion was made to the testimony, and no request was made for further instructions to the jury upon that subject. It is not necessary to express any opinion as to whether this testimony was admissible against Mr. Cummins. If it was inadmissible, the action of the circuit judge cured the error. See *Dykes* v. *Wyman*, 67 Mich. 236 (34 N. W. 561); *People* v. *Keefer*,

103 Mich. 83 (61 N. W. 338); *Harris* v. *Cable*, 113 Mich. 192 (71 N. W. 531); *Barnett* v. *Insurance Co.*, 115 Mich. 247 (73 N. W. 372).

The other assignments of error have been considered. We do not think any of them well taken.

The judgment is affirmed.

Carpenter, Montgomery, and Hooker, JJ., concurred. Grant, J., took no part in the decision.