JOHN GUMBERG AND CYRUS CLAPP v. MORRIS H. TREUSCH AND EMANUEL TREUSCH.

*Fraudulent conveyances—Garnishment—Evidence—Instructions to jury.*

1. When the issue to be tried involves a charge of fraud, evidence tending to establish the alleged fraud is freely admitted, and

a wide range of inquiry into transactions between the parties is allowed.

2. In a proceeding by judgment creditors under 3 How. Stat. § 8091, which makes a garnishee liable on account of and for the value of any of the property of the principal defendant in his possession, or which he has received and disposed of, and which is or was held by a conveyance or title void as to creditors of the principal defendant, it is error for the court, in his instruction to the jury, to predicate the right of recovery upon fraud perpetrated, not upon general creditors by the transfer of the property, but upon individual creditors, other than the plaintiffs, from whom the property had been purchased by the principal defendant.

3. The principal defendant and the garnishees were engaged in the same kind of business. The principal defendant had been at one time an employé of the garnishees, and later a partner with them, and later still had purchased from them the stock owned by the firm, and another broken stock belonging to a branch store which the garnishees had operated for a time at a loss. The theory of the plaintiffs was that the principal defendant had transferred a large amount of goods to the garnishees in payment of an indebtedness which was not *bona fide*, and which goods were procured for that purpose pursuant to a fraudulent scheme entered into by the principal and garnishee defendants. And it is held competent for the plaintiffs to show whether orders for goods given by the garnishees were filled in the usual course of business or otherwise; and that, immediately after the sale of the stocks of goods by the garnishees to the principal defendant, he sent out a number of letters to different dealers, asking for quotations and samples, it appearing that the principal defendant was without capital, and, according to the claim of the garnishees, his indebtedness equaled, if it did not exceed, his assets.

4. There was evidence from which the jury might infer that the transactions involving the purchase and transfer of the goods were collusive. And it is held that the same rule is applicable as in a case where a conspiracy is charged, and there is evidence tending to establish it; that everything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all; citing *Hamilton v. Smith*, 39 Mich. 222.

5. It was not error to refuse to allow the plaintiffs to show that the garnishees had settled with certain other creditors of the principal defendant, and the record of a judgment in a case between the garnishees and other creditors of the principal defendant, in favor of the creditors, was properly rejected.

6. The manager of a commercial agency testified in behalf of the plaintiffs to a statement made to him by the principal defendant as to his financial condition. After testifying on cross-examination that he had known the garnishees several years, he was asked if he had known of their having been engaged, during that time, in any dishonest transactions. And it is held that the court erred in permitting said latter inquiry to be made.

7. In a case involving, as the main issue, the alleged transfer of goods in fraud of creditors, the court instructed the jury that the presumption of law is in favor of honesty and fair dealing; that this presumption must be overcome; that where it is sought to overcome it by circumstances, in the absence of direct or positive proof of fraudulent acts, the proof must be clear and convincing; that it is not sufficient to prove facts and circumstances, or a combination of facts and circumstances, that create doubt in the mind as to the honesty and fairness of the transaction, but the proof must be of the kind and amount as to create in the mind a hearty conviction that the charge is true; that fraud is never to be presumed nor lightly inferred, but the proof should be clear and convincing; that it is not necessary to establish it by proof beyond a reasonable doubt, but it must be proof that carries to the mind a conviction—a hearty conviction—that the charge is true. And it is held that under the rule laid down in *Ferris v. McQueen*, 94 Mich. 367, the court was not justified in the use of the language given; that the words "clear proof" and "hearty conviction" are apt to mislead; that proof of facts and circumstances is sufficiently clear if it creates a belief that a fraud has been perpetrated, and a conviction so produced is sufficiently hearty to predicate a verdict upon.

Error to Kent. (Grove, J.) Argued October 24, 1894. Decided January 8, 1895.

Garnishment proceedings. Plaintiffs bring error. Reversed. The facts are stated in the opinion.

*Rood & Ryan*, for appellants.

*Fletcher & Wanty*, for defendants.

McGRATH, C. J. Plaintiffs obtained judgment against

103 MICH.—35.

Jacob Lustig, and under 3 How. Stat. § 8091, garnished Morris H. Treusch and Emanuel Treusch, composing the firm of M. H. Treusch & Bro. Lustig is a brother-in-law of the defendants. Prior to January 2, 1888, defendants had been engaged in the cigar business on Monroe street, in the city of Grand Rapids. They had, prior to January 28, 1889, started the Hub cigar store, on the corner of Bridge and Canal streets, for a customer, and, evidently through the failure of such customer, had succeeded to that business. Lustig had been in their employ at a salary of $10 per week. On January 2, 1888, they started, "as a side issue to our business on Monroe street," the Lustig Cigar Company store, the company consisting of the Treusches and Lustig; "giving Lustig a third interest in the net profits of said store,—he having no capital, just a working interest." "After three months' experience, we found it [the Hub cigar store] unprofitable, and concluded to get rid of it." The same witness says that on the 1st of January, 1889, the profits of the Lustig Company were $1,046. Lustig had overdrawn his account $271.11. "Lustig had a credit, when the Lustig Company was started, on our books, of $557.10. He had overdrawn the difference between this amount and $828.21. Against this debit, he had a right to one share of the profits. We had some money invested in the Lustig Company, and it hadn't been a success." On January 28, 1889, the Treusches sold to Lustig the Lustig Cigar Company business and the Hub cigar store. "We included in this sale the Lustig Cigar Company stock, the Hub stock, the book accounts and fixtures, and everything that belonged to the two businesses." The transaction is entered on the books of Lustig and of M. H. Treusch & Bro. as follows:

Mr. J. Lustig, City.

| | | |
|---|---:|---:|
| To purchase of stock Lustig Cigar Co. | $1,673 | 25 |
| To purchase of accounts Cigar Co. (good) | 3,325 | 79 |
| To purchase of accounts Cigar Co. (questionable) | 1,425 | 24 |
| To purchase of the Hub stock | 1,826 | 10 |
| To the purchase of the Hub outstanding accounts | 754 | 44 |
| To purchase of the Hub fixtures | 325 | 00 |
| As per attached inventory amount of debit to your account | 828 | 21 |
| Total | $10,158 | 03 |

Diverse.

| | | |
|---|---:|---:|
| Amount of credit to your account | $3,361 | 62 |
| Amount of your earnings in the Lustig Cigar Co. | 1,064 | 86 |
| Amount of credit for selling bad accounts, which were bought at 15 per cent. of face of inventory | 1,211 | 49 |
| Amount of check No. 1 | 2,520 | 06 |
| Amount of 30-day note | 1,000 | 00 |
| Amount of 60-day note | 1,000 | 00 |
| Total | $10,158 | 03 |

The first item of credit upon this account, of $3,361.62, "is composed of $2,804.52, which Mrs. Lustig transferred from her account to Lustig's account at that time, and the credit of $557.10 on his personal account." The second item is the profits of the business for the year, which "we gave to Lustig." The third item of credit is not explained, but it is, presumably, a mode of stating the discount on the accounts receivable, which had been transferred. On the day of the sale, Lustig is alleged to have given his note for $3,500 to Emanuel Treusch, and it was admitted on the trial that the $2,520.06 check (the fourth item of credit) was a part of the $3,500 borrowed from E. Treusch. It therefore appears that Lustig was started out with the—

Lustig Co. store stock................ $1,673 25
Hub store stock.................... 1,826 10
                                              $3,499 35
Accounts receivable...........................    4,293 98
Hub store fixtures............................      325 00

    Total assets...........................  $8,118 33

His liabilities were:

Due Mrs. Lustig..................... $2 804 52
Due E. Treusch.................... 3,500 00
Due M. H. Treusch & Bro............ 2,000 00
                                              $8,304 52

The testimony tended to show that a representative of R. G. Dun & Co. called on Lustig, March 4, 1889, who stated that his stock and fixtures inventoried $11,000; that he paid $9,000 cash, and gave two notes for $1,000 each. Upon that statement, he was given a rating of from $5,000 to $10,000. The testimony further tended to show that a representative of Bradstreet called in January, 1889, upon Emanuel Treusch, and interviewed him concerning the financial standing of Jacob Lustig; that Emanuel Treusch informed him that Lustig had purchased the business at a total of $10,158.03, and had paid for it by credit account, $3,361.62; earnings, $1,064.86; discount, $1,211.49; cash, $2,520.06; and two notes of $1,000 each; that Lustig had in the neighborhood of $8,000 in his business. No reference was made to any indebtedness to Mrs Lustig or to Emanuel Treusch. On this statement, Bradstreet gave Lustig a rating of from $5,000 to $10,000.

Lustig failed in July, 1891, having stock of the value of $10,000, and owing $8,400 in debts secured by chattel mortgage, and about $34,000 in unsecured debts. His books showed that from March 1, 1890, to August 1, 1890, his purchases were $20,636.81, and his sales, during the same period, $34,985; that from March 1, 1891, until

the date of his failure, his purchases were $42,952.46, and his sales $29,376.97; that from April 1, 1891, to the time of the failure, there was a deficit on cigars alone, by brands, of 221,000 cigars, which, at cost prices, were worth over $6,000; that after March 1, 1891, Lustig had bought of 26 new houses; that he had drawn out of his business from January 28, 1889, to the time of the failure, $10,-901; that on the 1st of March, 1891, the amount of Lustig's indebtedness to the Treusches was $10,466; that from April 11, 1891, to June 21, 1891, Lustig had sold to the Treusches, in merchandise, $11,948, to apply upon this indebtedness, and on June 22, 1891, the Treusches paid Lustig, in cash, to balance accounts, $1,222.19. Lustig's books show that on May 27, 1891, Lustig bought 10,000 Turn Verein cigars. On June 12 he sold the Treusches 10,000 Turn Verein. On May 28 Lustig bought 10,000 Gath cigars. On June 18 he sold the Treusches 10,000 Gath cigars. On April 23 Lustig bought 10,000 Snug Harbor cigars. On May 5 Lustig sold the Treusches 10,000 Snug Harbors. On May 27 Lustig bought 5,000 Gath cigars. On June 23 he sold the Treusches 5,000 Gath cigars. On May 27 Lustig bought 20,000 Americans. On June 12 he sold the Treusches 20,000 of the same brand. On April 17 Lustig bought 10,000 Rose Royals. On May 5 he sold the Treusches 10,000 of the same brand. Lustig lived opposite the residence of one of the Treusches, and there was testimony tending to show that the Treusches made frequent visits to Lustig's store; that goods were taken from Lustig's store to the store of the defendants, in the original packages, and at the noon hour, when the bookkeeper and shipping clerk were absent, and Lustig only was present. The testimony as to the representations made to the commercial agencies, and as to the goods being delivered in original packages and at the noon hour, was contradicted; and defendants offered testimony

tending to show that all goods sent from Lustig's store to defendants' place of business were charged on Lustig's books and credited on defendants' books. The parties, however, were related by marriage. Defendants were well advised of Lustig's financial condition. They knew that, at the start, 43 per cent. of his assets consisted of two broken stocks of goods, and the remaining 57 per cent. consisted of book accounts receivable and store fixtures. They were constant visitors at his place of business. They were in the same line of business in the same city. They knew what the business had been at both the Hub store and the Lustig Company store. They claim to have been his principal creditors at the start.

Under the facts stated, the plaintiffs should have been allowed a wider range of inquiry in the examination and cross-examination of witnesses than was permitted. It is well settled that, when the issue involves a charge of fraud, evidence tending to establish such fraud is freely admitted, and a wide range of inquiry into transactions between the parties is allowed. The transactions covered a period of two years and a half. Although the alleged indebtedness was but $10,000, goods of the value of several times that amount were purchased, and merchandise of the value of three or four times the amount of the indebtedness was traced to the defendants. Lustig's indebtedness at the start, if any existed, was $8,300, but at the finish it was $42,000, and Lustig had appropriated to himself nearly $11,000.

The trial court, after the discussion of other questions, charged the jury as follows:

"This leaves the case where, in my judgment, it should be left, to be determined upon the single question, whether or not,—or the two questions, perhaps,—whether or not, first, Lustig did obtain goods from divers persons during the three or four months before his failure (the time covered by the evidence) with a fraudulent intent at the time

not to pay for them, and, if he did enter into that fraud-
ulent purpose and scheme, were the Treusch Bros. impli-
cated with him in it?   Did they participate in it?   Were
they parties to that fraudulent scheme?   If you find both
of these questions in the affirmative, and that pursuant to
such a fraudulent scheme on the part of Lustig, participated
in by the Treusch Bros., for the purpose of enabling them
to get goods in that way in payment of the debt which
they held against Mr. Lustig, the plaintiffs then are en-
titled to recover in this, action the amount of the judg-
ment which they have already recovered against the principal
defendant; otherwise, they are not entitled to recover."

The plaintiffs have a right to complain of this instruc-
tion, for the reason that it limited the issue.   If the in-
debtedness to the Treusches was not *bona fide*, the con-
veyance of the goods to them was void as to creditors.   If
any goods were transferred to the defendants without
consideration, or for a consideration that was merely nom-
inal, plaintiffs should recover.   If the value of either the
Lustig stock or the Hub store stock, or the fixtures or
the accounts, was inflated, in pursuance of a scheme to
establish Lustig's credit, and obtain goods, and turn them
over to defendants, the indebtedness to which the goods
are alleged to have been applied cannot be said to have
been *bona fide*, and plaintiffs are entitled to recover.   If
such fraudulent purpose entered into the transfer to Lus-
tig, the indebtedness originating from it, or based upon
it, cannot be said to have been *bona fide*, and plaintiffs
are entitled to recover.   The defendants transferred to
Lustig two broken stocks of goods and certain store fix-
tures, the remnants of business ventures that had
not been attended with satisfactory results; and although
defendants continued in the same business in the same
city, and certain of the accounts, amounting to $754.44,
were due to them, and were not in any way connected
with the business of the Lustig Company, yet, of the
assets, booked, charged, and transferred to Lustig at

$10,000, and with which he—a brother-in-law, and with-out capital—started out to do business, over $5,500 was represented by accounts due the Lustig Company and the Hub store. The jury were entitled to take all the facts and all the dealings into consideration, in determin-ing whether the original indebtedness was *bona fide*. In determining whether the original indebtedness was *bona fide*, and whether the transfer to defendants was made in payment of an indebtedness which was not *bona fide*, or made with intent to delay, hinder, and defraud creditors, the jury were entitled to consider, not only the origin of the indebtedness, the consideration for it, but the con-duct of the parties, the means employed to establish Lus-tig's credit, the representations made to the commercial agencies, the large purchases of goods without prospect of paying for them, the transfers of merchandise to defend-ants, and all the other facts and circumstances.

We cannot agree with the majority opinion in *Treusch v. Ottenburg*, 4 C. C. A. 629, 54 Fed. Rep. 867, but con-cur in the views expressed by Judge Taft in the dissent-ing opinion therein. The statute provides that—

"If any person garnisheed shall have in his possession any of the property aforesaid of the principal defendant, which he holds by a conveyance or title that is void as to creditors of the defendant, or if any person garnisheed shall have received and disposed of any of the property aforesaid of the principal defendant, which is held by a conveyance or title that is void as to creditors of the de-fendant, he may be adjudged liable as garnishee on account of such property, and for the value thereof, although the principal defendant could not have maintained an action therefor against him."

Judge Taft, in the Ottenburg case, says:

"The action by the defendants in error, therefore, was, as general creditors, to recover by garnishee process the value of the goods, which they had never owned, to the amount of their claim against Lustig. The only ground

for their action was that Lustig, being the owner of these goods and in failing circumstances, transferred them, in fraud of their rights as general creditors, to the Treusch Bros. The fraud which Lustig had been guilty of, in procuring the goods transferred to the Treusch Bros. from other creditors than the plaintiffs, gave the plaintiffs no right to complain. The plaintiffs' right to recover goods or their value from Treusch was wholly dependent on Lustig's title to them and ownership in them. It was not material, as an ultimate fact, in this controversy, that the Treusch Bros. conspired with Lustig to defraud the persons from whom the goods held by Treusch were purchased. The persons thus defrauded could, of course, recover in trover the value of the goods from the Treusch Bros., as transferees with knowledge of the fraud in Lustig's title; but the plaintiffs, from whom the goods were not purchased, had no such right. Their rights grew out of the fraud, if any, in the transfer by Lustig to the Treusch Bros. of goods which, so far as third persons were concerned, belonged to him, in fraud of general creditors. In order to show that the transfer of these goods from Lustig to Treusch was in fraud of general creditors, it might be relevant to introduce evidence of a general scheme of fraud in the purchase of the goods, in which the Treusches and Lustig were acting together, as tending to show a guilty relation between Lustig and Treusch, which would overcome a claim that Treusch was an honest creditor, honestly receiving pay for his debts. But the ultimate fact, which must have been established in order that the plaintiffs below could have the right to set aside the transfer from Lustig to Treusch, was fraud in that transfer, not as against the original owners of the goods, but as against the general creditors of Lustig, solely on the hypothesis that Lustig was the owner of the goods transferred. Any other view seems to me to confuse the right of a general creditor, which is that the debtor shall not hinder or delay the collection of his debt by fraudulently disposing of his assets available for its payment, and the right of the vendor, who has been defrauded into selling his goods, to set aside the sale and recover the goods."

The instruction given predicated the right of recovery upon fraud perpetrated, not upon a general creditor by the tranfer, but upon individual creditors, other than plaintiffs,

from whom the goods had been purchased, and was therefore erroneous.

It was competent to show by Lustig's employés just how and when orders for goods given by defendants were filled,— whether as in the usual course of business or otherwise.

The evidence that, immediately after the sale to Lustig, he sent out a number of letters to different dealers, asking for quotations and samples, should have been admitted. Such requests, made by a responsible party in the usual course, would not, standing alone, be indicative of a fraudulent purpose; but here Lustig was without capital, and, according to defendants' claim, his indebtedness equaled, if it did not exceed, his assets.    It was also proper to show what was done with the samples received.

The objection made to the introduction of Lustig's testimony is without force.[1]    There was evidence from which the jury might infer that the transactions were collusive, and the same rule is applicable as in a case where a conspiracy is charged, and there is evidence tending to establish it.    Everything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all.    *Hamilton v. Smith*, 39 Mich. 222.

The court very properly refused to permit plaintiffs to show that defendants had settled with certain other creditors, and the record of the judgment in a case between defendants and other parties was properly rejected.

The court erred in permitting defendants' counsel, upon cross-examination of the witness Ferguson, to ask if he had ever known of any dishonest transactions on the part of defendants.

---

[1] Plaintiffs offered in evidence the examination of Lustig taken on supplementary proceedings in the principal case, and containing statements relating to his business, failure, and relation to the Treusches.

The court further instructed the jury that—

"The proof to establish fraud should be clear and convincing. If the circumstances are equally as consistent with honesty and fair dealing as with fraudulent and dishonest transactions, then it must be said that the fraud is not established. The presumption of law is in favor of honesty and fair dealing, and that presumption must be overcome; and where it is sought to overcome it by circumstances, in the absence of direct or positive proof of fraudulent acts, the proof must be clear and convincing. It is not sufficient to prove facts and circumstances, or a combination of facts and circumstances, that create doubt and suspicion in the mind as to the honesty and fairness of the transaction, but the proof must be of the kind and amount as to create in the mind a hearty conviction that the charge is true. Fraud is never to be presumed, neither is it to be lightly inferred, but the proof should be clear and convincing. It is not necessary to establish it by proof beyond a reasonable doubt, but it must be proof, as I have said, that carries to the mind a conviction—a hearty conviction—that the charge is true."

Under the rule laid down in *Ferris v. McQueen,* 94 Mich. 367, the court was not justified in the use of the language given. The words "clear proof" and "hearty conviction" are apt to mislead. Proof of facts and circumstances is sufficiently clear if it creates a belief that a fraud has been perpetrated, and a conviction so produced is sufficiently hearty to predicate a verdict upon.

The judgment is reversed, and a new trial granted.

The other Justices concurred.