NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0194n.06
Filed: March 12, 2009

No. 07-1864

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROBERT RIVET, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| STATE FARM MUTUAL AUTOMOBILE | ) | EASTERN DISTRICT OF MICHIGAN |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff-Appellee, | ) | |
| | ) | |
| MARK L. SILVERMAN; et al. | ) | |
| | ) | |
| Counter-Defendants-Appellants. | ) | |

Before: MERRITT, COLE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. This appeal stems from a six-week jury trial, as well as a related bench trial, that led to a $4.2 million verdict and several declaratory judgments, premised on fraud and fiduciary breach, against attorney Mark Silverman and State Farm claim representative Linda Swagler. We affirm.

I.

In 1997, Linda Swagler, a State Farm claim representative, hired Silverman to represent her daughter in a medical-malpractice claim against a hospital. As the case proceeded, Swagler kept her supervisor at State Farm informed about its progress—and about her growing admiration for

Silverman. According to her supervisor, Swagler's admiration verged on "hero-worship": "She described him as masterful at his work. She would say things like he's awesome, he's incredible. . . . [S]he spoke of him very, very highly, which I would expect if someone were doing a great job on a case, but I thought she took it to another level." JA 1833. In February 2000, Swagler's supervisor warned her that she should "let [him] know if [Silverman] should ever become involved with any of her files" because he thought a "conflict of interest existed between her and Mr. Silverman." JA 1836. In 2001, after Silverman obtained a $1.5 million settlement on behalf of Swagler's daughter, Swagler's supervisor repeated his warning, noting that if Silverman represented an individual against State Farm and Swagler handled the claim, "[i]t just would really, really look bad . . . knowing the history [they] ha[d]." JA 1838.

Nevertheless, over the next several years, Silverman represented at least nine individuals who had filed claims against State Farm, and Swagler worked as the case manager for State Farm on each claim. In 2005, after learning what had happened and after investigating the settlements in these cases, the insurance company filed counterclaims against Silverman and Swagler in one of Silverman's pending diversity cases, alleging that the two of them had "methodically robbed State Farm of millions of dollars by causing State Farm to issue unjustified and excessive payments . . . either directly to Silverman or to injured persons . . . , who in turn, endorsed the payments over to Silverman," JA 315. State Farm premised its claims on fraud and fiduciary breach, and sought declaratory judgments voiding the settlement agreements obtained by Silverman for six of his clients.

Several of the claims were tried to a jury, which found against Silverman and Swagler on all

counts and awarded damages of $4.2 million. The declaratory-judgment claims were tried to the court, which found in favor of State Farm on all counts and voided all six settlement agreements. The district court entered judgment in April 2007, and denied Silverman's motions for judgment as a matter of law and for a new trial. Silverman appealed, as did the six clients affected by the voided settlement agreements.

II.

A.

Silverman first argues that State Farm failed to present sufficient evidence of fraud. To show fraud under Michigan law, a plaintiff must establish (1) the existence of a knowing or reckless material misrepresentation, (2) reliance and (3) injury. *Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543, 546 (Mich. 2000).

The jury had ample grounds for finding Silverman responsible for several knowing and material misrepresentations. The record, as an initial matter, shows that Silverman himself made several misrepresentations: The court-appointed computer expert testified that Silverman backdated several of the settlement agreements between State Farm and his clients; a doctor testified that Silverman submitted a forged prescription for attendant care and supervision for his client; a care provider for one of Silverman's clients testified that Silverman instructed her to bill as if she had provided 24 hours of care per day, even though she agreed only to provide four to eight hours of care

per day; and a State Farm case manager (who replaced Swagler) testified that Silverman misrepresented the claimant's previous need for 24-hour attendant care.

In view of Silverman and Swagler's collusive agreement, the jury also was permitted to hold Silverman responsible for Swagler's fraudulent statements. "Where there is evidence that parties are acting in collusion, [e]verything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all." *Kefuss v. Whitley*, 189 N.W. 76, 83 (Mich. 1922) (dealing with a claim to rescind a contract) (internal quotation marks omitted); *see also Kahn v. Friedman*, 45 N.W.2d 18, 19 (Mich. 1950); *Martinoff v. Jackson News Publ'g Co.*, 197 N.W. 576, 577 (Mich. 1924); *McDonald v. Smith*, 102 N.W. 668, 669–70 (Mich. 1905); *Gumberg v. Treusch*, 61 N.W. 872, 875 (Mich. 1895).

Silverman does not deny that Swagler made numerous fraudulent statements during the relevant years. He instead denies that the two of them colluded to defraud State Farm, maintaining that her misstatements therefore may not be used against him. Yet the frequency of the communications between Silverman and Swagler, well documented in the record, by itself suggests a contrary conclusion. Over two years, Swagler called Silverman almost 700 times. On November 20, 2003, the day State Farm auditors interviewed Swagler about several claimants for whom Silverman served as attorney, they spoke on the phone twelve times, including eight phone calls initiated by Silverman. Swagler even referred State Farm claimants to Silverman—which might have made some sense based solely on Silverman's successful representation of her daughter but made no sense given her job as a State Farm claim representative. *See* JA 1902 (a State Farm

employee testifying that in her 20 years at State Farm, she had never known of anyone who had referred a claimant to an attorney). And of course all of this happened after Swagler was told by her supervisor not to work on claim files in which Silverman was involved.

Silverman, the record shows, also benefitted from Swagler's misrepresentations: State Farm often issued checks directly to Silverman, and Silverman ensured that payment would continue to come directly to him by, for example, instructing a provider to send bills to him instead of sending them directly to State Farm, and arranging for the provider to be fired after she began billing State Farm directly. Even if Swagler, as the insider, made the vast majority of the fraudulent misstatements, Silverman knew what she was doing and benefitted directly from it. Having participated in the scheme and "accepted the fruit of the fraud," *Kefuss*, 189 N.W. at 83, he cannot disclaim responsibility for Swagler's actions.

Silverman insists that, "[w]ithout a scheme/conspiracy claim, there is no legal basis for using evidence about what Ms. Swagler said or did to hold Mr. Silverman vicariously liable." Br. at 40. But he cites no Michigan case for the proposition that a freestanding conspiracy claim is a precondition to imposing liability on Silverman for Swagler's actions. At least one Michigan case holds it is not, reasoning that the "concert of action theory does not depend on proving an independent claim of civil conspiracy. It requires evidence that parties knowingly acted to further a common purpose." *Korn Family Ltd. P'ship v. Harbor Bldg. Co.*, No. 272813, 2008 WL 239651, at *3 (Mich. Ct. App. Jan. 29, 2008). And other cases do not on their face involve underlying conspiracy claims. *See, e.g.*, *Gumberg*, 61 N.W. at 875 ("There was evidence from which the jury

- 5 -

might infer that the transactions were collusive, and the same rule is applicable as in a case where a conspiracy is charged, and there is evidence tending to establish it. Everything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all.").

To the extent Silverman means to complain that he lacked notice that State Farm would use Swagler's misstatements against him, that is hard to take seriously. The essence of State Farm's allegation was that Silverman used Swagler, as a State Farm insider, to carry out the fraudulent scheme. The first paragraph of the counterclaim accuses Silverman and Swagler of engaging in a "scheme to defraud . . . for the sole purpose of enriching Silverman and Swagler, at the expense of State Farm, and in some instances, at the expense of Silverman's own clients and patients." JA 315. And to the extent he means to argue that the court should have given "a fraud conspiracy/scheme instruction," Br. at 40, he has not to this day explained the instruction that should have been given or what authority required it to be given, *see Leary v. Livingston County*, 528 F.3d 438, 449 (6th Cir. 2008). The overwhelming evidence of a conspiracy between them, at any rate, shows that any such error would have been harmless. *See United States v. Kuehne*, 547 F.3d 667, 681 (6th Cir. 2008).

State Farm also presented ample evidence of reliance and injury. Its damages witness testified at length about each of the payments that State Farm included in its total damage calculation, noting that the final damages figures "represent the difference between the monies State Farm paid to Mark Silverman and his clients and what State Farm believes to be the maximum amount that [State Farm] would have paid, had Mark Silverman not been involved." JA 2100. For

each payment included in the total damages calculation, the witness explained why the Silverman-Swagler scheme caused the insurance company to pay more than it should have.

For example: she noted that State Farm requested damages for two back payments that Swagler had issued despite the fact that "[t]here was no basis, no documentation, nothing to warrant payment of these two payments," JA 2105; that State Farm requested damages for an overpayment in continuing care for a claimant, explaining that "[t]here was support and documentation in the files" to justify the amount that had been provided for care before Silverman became involved but that "there was no documentation" to justify the increase that Swagler had paid after Silverman became involved, JA 2107; and that State Farm requested damages for back payments made in reliance on a fraudulent letter by Silverman indicating that one claimant was "horribly injured" and "needed back attendant care." JA 2114.

Silverman claims that the damages evidence "was based upon assumptions, not facts," Br. at 30, and that State Farm treated certain payments as "damages because they were made after Silverman became involved, not because Mr. Silverman made an intentional misrepresentation of fact," Br. at 31 (internal quotation marks omitted). Yet this is merely a reprisal of his argument, already rejected, that a member of a fraudulent scheme does not have to answer for the fraudulent conduct of each member of the coordinated scheme. To the extent Silverman means to say there was no evidence of injury based on his assessment of the evidence regarding payments to three of his clients, that argument does nothing for him. State Farm presented evidence of injury tied to the claims of several other clients, and Silverman does not challenge these. Evidence of damages from

even one misstatement suffices to establish the injury necessary to reject a sufficiency challenge to the fraud verdict.

B.

Silverman separately argues that he cannot be held liable for aiding and abetting Swagler's breach of fiduciary duty because Swagler's misconduct was in urging State Farm to "pay[] too much money" in a series of settlement agreements and Silverman had no duty to "avoid getting too good a deal" for his clients. Br. at 48. But there is a line between zealous representation and aiding and abetting fraud—which is why a lawyer may not use fraud to obtain a verdict or look the other way when he knows a client has testified falsely. *See Nix v. Whiteside*, 475 U.S. 157, 166 (1986) ("[C]ounsel's duty of loyalty and his overarching duty to advocate the defendant's cause . . . [are] limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth. Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law.") (internal quotation marks omitted); *People v. Atkins*, 243 N.W.2d 292, 299 (Mich. 1976). Nor was this merely an aiding and abetting of Swagler's negligence. State Farm's breach-of-fiduciary-duty counterclaim alleged that "Swagler's extensive and pervasive breach of her fiduciary duties to State Farm displays a high level of moral turpitude and wanton dishonesty." JA 417. The evidence at trial bore out this allegation. Among a long list of bad acts, Swagler falsified her log notes and attested to conversations with doctors that never happened.

In offering two case citations in support of this argument, Silverman gives analogy a bad name. *Friedman v. Dozorc*, 312 N.W.2d 585 (Mich. 1981), held that one party may not sue an opposing party's attorney "on a theory of negligence because an attorney owes no duty of care to an adverse party in litigation." *Id.* at 588. True enough, but State Farm accused Silverman of aiding and abetting a breach of fiduciary duty, not negligence, and *that* claim does not turn on a duty of care owed by Silverman to State Farm. *Reynolds v. Schrock*, 142 P.3d 1062 (Or. 2006), "h[e]ld that a lawyer may not be held jointly liable with a client for the client's breach of fiduciary duty unless the third party shows that the lawyer was acting outside the scope of the lawyer-client relationship." *Id.* at 1063. Silverman, however, was not Swagler's attorney, and *Reynolds* expressly does not shield attorneys from liability for their fraudulent actions, s*ee id.* at 1069.

## C.

Silverman next challenges several of the jury instructions. To obtain a new trial on this ground, he must show not only that there were "deficiencies" in the instructions but also that "the instructions, taken as a whole, [were] misleading or [gave] an inadequate understanding of the law." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003).

He first complains about the "fail[ure] to disclose" instruction, JA 1639, which as he sees it authorized a verdict based on "fraud by omission," Reply Br. at 19. Silverman cites just one case in his opening brief in support of this argument, *see M&D, Inc. v. McConkey*, 585 N.W.2d 33 (Mich. Ct. App. 1998), and it deals only with the duty of sellers to disclose defects in their products, *id.* at

36.  Why that case citation helps him is never explained.  More fundamentally, he fails to account for the fact that "[i]n Michigan, even without a fiduciary relationship, a party is under a duty to use diligence in making a complete disclosure of facts where partial disclosure may convey false impressions and mislead the plaintiff.  Such half-truths or non-disclosures are considered to be concealment of facts and, therefore, misrepresentations." *Strand v. Librascope, Inc.*, 197 F. Supp. 743, 753 (E.D. Mich. 1961).  Silverman offers no reason why that requirement does not apply here, and it is particularly difficult to imagine why a jury could not hold him responsible for failing to disclose Swagler's fraudulent behavior.  As we have already explained, moreover, Silverman is liable for Swagler's failures, and he never challenges the application of the failure-to-disclose instruction to her actions.

He next claims that the damages instructions were misleading.  The district court delivered one general damages instruction for all three charges, asking the jury to "determine the amount of money which reasonably, fairly, and adequately compensates State Farm for each of the elements of damage which you decide has resulted from the fraud, breach of fiduciary duty, or aiding and abetting breach of fiduciary duty, engaged in by the Counter-Defendants, taking into account the nature and extent of the injury," JA 1646.  Silverman half-heartedly suggests that this instruction is only "for negligence claims," Br. at 51, but offers no explanation (or authority) why.

He separately insists that the court should have given instructions about aiding and abetting and fraud, but he provides no precedent in support of this argument either.  It is unclear, in any event, how additional instructions would have helped him.  Silverman suggests that the appropriate

damages for fraud "are how much more was paid because the plaintiff relied upon a misrepresented fact to its detriment," Br. at 51, and State Farm requested damages according to the same "overpayment" calculation. *See* JA 2100 (testifying that the damages calculations "represent the difference between the monies State Farm paid to Mark Silverman and his clients and what State Farm believes to be the maximum amount that [State Farm] would have paid, had Mark Silverman not been involved"). Because the jury accepted the damages figure proposed by State Farm, it is clear that they were not misled or influenced by the general jury instructions on damages—at least for the fraud claim. And because the jury could have awarded this entire amount as damages on the fraud claim, we need not review the propriety of the instructions for the aiding and abetting claim. *See Consenco Fin. Servicing Corp. v. N. Am. Mortgage Co.*, 381 F.3d 811, 823 (8th Cir. 2004).

He next challenges the charge on aiding and abetting a breach of fiduciary duty. In arguing that the instruction improperly omitted an element of the offense—that "the fiduciary and the aider/abetter profited" from the breach, Br. at 54—Silverman cites a case that neither mentions nor requires that element. *See German Free State of Bavaria v. Toyobo Co.*, 480 F. Supp.2d 958, 965 (W.D. Mich. 2007). To our knowledge, there is no such requirement. Nor does it make any sense that there would be: Fiduciaries may readily—and quite egregiously—breach their duties of good faith without directly benefitting financially from the breach.

D.

Silverman next argues that the district court erred in denying his motion to amend or alter the judgment. *See* Fed. R. Civ. P. 59(e). We review the denial of a motion to amend or alter the judgment for abuse of discretion. *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476 (6th Cir. 2007). A court may grant a motion to alter or amend judgment only if there was "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005). In arguing that there was an "error of law," Silverman places all of his eggs in an insufficiency-of-the-evidence argument, one we already have rejected, one we therefore need not discuss again.

E.

Silverman next argues that the district court should have compelled State Farm "to produce a prepared [Civil Rule] 30(b)(6) designee." Br. at 27. Under that discovery rule, an organization must designate an individual "to testify on its behalf . . . about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). In May 2006, Silverman deposed State Farm's 30(b)(6) witness. At a hearing in July 2006, Silverman argued that the witness was not able to testify about what State Farm "would have had to pay" in these cases absent the fraud. JA 1810. State Farm responded that it could not answer all of Silverman's questions, in part because Silverman had "never given [State Farm] any underlying backup data to show what care was provided to which individual, during which period." JA 1816. The judge noted that, "if [State

Farm] get[s] that information before trial, they are required to notify" Silverman.  JA 1818.  In January 2007, five weeks before trial, State Farm provided additional information on this score, prompting Silverman to file a motion for sanctions, which the district court ultimately denied.

Granting for the sake of argument that Rule 30(b)(6) imposes a duty on a company to make a good-faith effort to identify and prepare its Rule 30(b)(6) witnesses, that does not help Silverman. State Farm's initial answer to Silverman's objection about why its witness could not answer all of the damages questions was a reasonable one, and the record simply offers no other hand-hold for maintaining that the district court abused its discretion in concluding that State Farm honored its discovery obligations.

Nor, for similar reasons, does the record support Silverman's allegation that State Farm engaged in "a pattern of deliberately concealing evidence" and that the district court abused its discretion by "allowing State Farm to offer evidence of damages." Br. at 29.  Silverman has not shown that State Farm deliberately concealed evidence (or even that it could have delivered the information in its final interrogatory answer sooner than five weeks before trial), confirming that the district court did not abuse its discretion in refusing to grant discovery sanctions. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 510 (6th Cir. 2002).

F.

Silverman independently argues that the district court committed reversible error by refusing to admit evidence of a settlement agreement between State Farm and a non-party claimant whom Silverman had represented. The district court refused to admit the evidence because it was "a confidential settlement agreement," JA 2262, and because it was signed in 2006—several years after the events at issue in this case. As Silverman sees it, the agreement would have "rebutted numerous theories" offered by State Farm, Br. at 33, because it showed that "other State Farm representatives did exactly what it was fraudulent for Ms. Swagler to do," Reply Br. at 12—that other State Farm employees approved a large settlement agreement between State Farm and one of Silverman's employees. But he fails to come to grips with three realities. One, he never responds to one of the district court's explanations—that it was a 2006 agreement—and thus was made after the key events in this case and at a time when Silverman may have decided to reform his ways. Two, he fails to explain why a similar settlement agreement that was admitted at trial did not suffice to present this theory to the jury, making any error harmless. *See Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994). Three, the agreement by its terms purported to be confidential. No abuse of discretion occurred.

G.

Three of Silverman's clients—Tony Beard, Betty Davis and Raymond Andres—argue that, because they had claims pending against State Farm in Michigan state court, they should not have

been added as counter-defendants to this case. Abuse-of-discretion review applies. *Travelers Indem. Co. v. Bowling Green Prof'l Assoc.*, 495 F.3d 266, 271 (6th Cir. 2007).

In addressing this argument, we consider "(1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata'; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective." *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

In considering these factors, the district court made the following observations: Because the fraud claim involved the named counter-defendants, separate declaratory-judgment actions would duplicate, if not multiply, the presentation of the evidence; because the damages requested in the fraud claim included only money that State Farm had *already* paid to Silverman and his clients, "the only way to get total relief is through a declaratory judgment" invalidating future payments under the agreement, R. 448 at 26; nullification of the settlement agreement would determine the rights of the clients in the state-court actions; and there was no evidence that State Farm was engaged in forum shopping. On balance, this reasonable assessment of the *Grand Trunk* factors does not amount to an abuse of discretion.

No. 07-1864
*Rivet v. State Farm Mut. Auto. Ins. Co.*

## H.

Silverman makes several other arguments that repeat claims we have already rejected, that are unsupported or undeveloped, that were not raised below, or all of the above, and accordingly, we need not address them. *Leary*, 528 F.3d at 449.

## III.

For these reasons, we affirm.