NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0085n.06

Case No. 07-2352

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 08, 2011**
LEONARD GREEN, Clerk

| | |
|---|---|
| DARION TURNER, | ) |
| | ) |
| Petitioner-Appellant, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| KENNETH ROMANOWSKI, Warden, | ) DISTRICT OF MICHIGAN |
| | ) |
| Respondent-Appellee. | ) |
| | ) |
| ———————————————— | ) |
| | ) |
| | ) |

BEFORE: BATCHELDER, Chief Judge; MOORE and COLE, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. Petitioner Darion Turner ("Turner") appeals the district court's denial of his petition for writ of habeas corpus. Because Turner failed to comply with the applicable one-year statute of limitations, and because we find that equitable tolling is not appropriate in this case, we AFFIRM the judgment of the district court in denying Turner's petition for writ of habeas corpus, albeit on alternative grounds.

**PROCEDURAL HISTORY**

On June 14, 1993, Turner was convicted in state court of two counts of second-degree murder and one felony firearm offense. Turner appealed his conviction to the Michigan Court of Appeals, raising two claims: (1) that the trial court erred in admitting evidence of the June 16 shooting; and (2) that the prosecutor engaged in misconduct by not revealing the details of a plea bargain reached with one of the state's witnesses. The Court of Appeals affirmed Turner's conviction on December

21, 1994.  In January 1995, Turner filed an application for leave to appeal to the Michigan Supreme

Court, raising the same claims he had raised in his initial appeal and adding two new claims:  (1) that

the verdict was against the great weight of the evidence; and (2) that appellate counsel was

ineffective for failing to raise the first claim.  The Michigan Supreme Court denied Turner's

application on November 21, 1995, because it was not persuaded that the questions presented should

be reviewed.[1]

In October 2002, almost seven years after his sentence became final, Turner filed a motion

for relief from judgment with the state trial court, alleging prosecutorial misconduct, ineffective

assistance of trial and appellate counsel, newly discovered evidence of actual innocence, defective

jury instructions, and denial of due process due to the cumulative effect of errors.  The trial court

denied the motion in June 2003, and later denied Turner's motion for reconsideration.  In March

2004, the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to

relief under Michigan Court Rule 6.508(D), and in December 2004, the Michigan Supreme Court

denied leave to appeal for the same reason.

Petitioner filed his habeas petition with the district court in February 2005, raising eleven

claims for relief.  The State of Michigan filed a motion to dismiss in September 2005, arguing that

Turner had failed to comply with the one-year statute of limitations contained in 28 U.S.C. § 2244.

On September 23, 2005, Turner filed a motion to expand the record, claiming that the preliminary

_____

[1]On October 6, 2009, Turner filed a Motion for Judicial Notice of State Court Records, submitting certain documents filed during Turner's state court proceedings.  While it is not entirely clear that a motion for judicial notice is the appropriate method for bringing the contents of the state court record to our attention, we grant Turner's Motion for Judicial Notice to the extent necessary for consideration of the state court records.

examination transcripts of his co-defendant Mark Smith would corroborate Smith's affidavit attesting that Smith and others committed the crimes, and that Turner was not involved. On March 22, 2006, the district court stayed the case pending resolution by the United States Supreme Court of *House v. Bell*, 547 U.S. 518 (2006), a case in which the district court believed existing precedent regarding actual innocence claims would be reexamined. The district court also dismissed, without prejudice, all pending motions, including Turner's motion to expand the record and the State's Motion to Dismiss. Turner then filed a renewed motion to expand the record, asking that the State be required to produce the transcripts of the preliminary examination of Smith.

On November 8, 2006, the district court issued an order lifting its stay and ordering the State to produce the transcripts of co-defendant Smith's preliminary examination. This order expressly stated that "[t]he Court subsequently will adjudicate [the State's] motion to dismiss the habeas petition." Turner subsequently renewed a number of his motions that had been denied when the case was stayed, but did not again renew his motion to expand the record, which had been addressed by the district court's requirement that the State produce the transcripts. The State did not renew its Motion to Dismiss.

The State failed to produce the requested transcripts in a timely manner and Turner filed a request that the district court find that the State had waived its statute of limitations defense by failing to comply with the district court's order. The State responded that "[d]espite diligent and repeated efforts," it could not locate the requested transcripts. The State indicated it was not even sure that the transcripts had ever been prepared. Turner responded that he knew that the transcripts existed and that he had been previously provided with those transcripts by his trial counsel.

On September 28, 2007, the district court issued its Opinion and Order which denied Turner's habeas petition. The district court never addressed the State's Motion to Dismiss, addressing Turner's claims on their merits "regardless of whether they are barred from review by the statute of limitations or the doctrines of exhaustion and procedural default," because neither procedural default, exhaustion, nor statute of limitations defenses were "jurisdictional bars to substantive review of [Turner's] claims." Because the district court did not address the State's statute of limitations arguments, it made no finding regarding the applicability of equitable tolling, which would require a showing of actual innocence, but it did discuss the claims in which Turner asserts actual innocence. The district court denied Turner's request for an evidentiary hearing and denied Turner's petition on the merits.

## ANALYSIS

### I.    STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides for a one-year period of limitations that begins to run on "the date on which the judgment becomes final by the conclusion of direct review (or the expiration of the time for seeking such review)." 28 U.S.C. § 2244(d)(A). When a prisoner's conviction becomes final prior to AEDPA's effective date, he is entitled to a one-year grace period in which he may file his petitions. *McClendon v. Sherman*, 329 F.3d 490, 494-95 (6th Cir. 2003). Moreover, while the period of limitations is tolled while state post-conviction proceedings are ongoing, the period does not reset upon the resolution of those state proceedings. *Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001).

Because Turner's conviction became final prior to the passage of AEDPA, the period of limitations began to run on April 24, 1996. *Id.* at 517. It expired 365 days later, on April 24, 1997, more than five years prior to Turner's state post-conviction efforts. It is clear, therefore, that Turner failed to file his habeas petition within the one-year period of limitations, as required by AEDPA. Turner argues, however, that the State waived any potential statute of limitations defense when it failed to raise it properly before the district court and when it failed to comply with a district court order requiring it to provide certain transcripts. Turner's arguments are unsupported by the record.

The State responded to Turner's habeas petition by filing its Motion to Dismiss, specifically raising its statute of limitations argument. The district court dismissed all pending motions, including the Motion to Dismiss, without prejudice, when it stayed the case pending the Supreme Court's decision in *House v. Bell*. Turner argues that because the State failed to renew the Motion to Dismiss, it waived its statute of limitations arguments. But Turner ignores the express language in the district court's order lifting the stay, which indicated that the court would consider the motion to dismiss after certain transcripts were produced. While the State likely should have renewed its Motion to Dismiss out of an abundance of caution, it was not unreasonable for the State to conclude that the district court, in declaring that it would adjudicate the Motion to Dismiss, had renewed the Motion to Dismiss *sua sponte*. Turner argues that the State's failure to renew the Motion deprived him of the opportunity to supplement the record with additional evidence in light of the Supreme Court's decision in *House v. Bell*, but he fails to identify any such evidence that he could or would have provided.

Turner next argues that the State's failure to provide the transcripts ordered by the district court "deprived the court of potentially critical evidence supporting Mr. Turner's equitable tolling claim." This argument, essentially an argument for discovery-related sanctions pursuant to Fed. R. Civ. P. 37, is made without factual or legal support.

We review a district court's denial of a motion for discovery sanctions for an abuse of discretion. *Rivet v. State Farm Mut. Auto. Ins. Co.*, 316 F. App'x 440, 448 (6th Cir. 2009) (citing *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 510 (6th Cir. 2002)). The State attested that it attempted to find the requested transcripts, but was not even sure whether they had ever been prepared. The only evidence that Turner provides to contradict the State's assertions is his own statement that he possesses them, or at least possessed them at one time. We are thus presented with a peculiar circumstance, where a party urges sanctions for the opposing party's failure to produce evidence, the existence of which evidence is supported only by a sworn statement that the requesting party knows it exists because he possesses it. We find that Turner's sworn statement is insufficient to support a finding that the district court abused its discretion in declining to sanction the State for failing to produce the relevant transcripts.

Having found Turner's objections to be without merit, we now hold that Turner's petition is untimely and barred by the statute of limitations. Therefore, we will consider the merits of Turner's petition only if he can establish that he is entitled to equitable tolling.

## II.   EQUITABLE TOLLING

If a petitioner fails to file his habeas petition within the period of limitations, he must show that he is entitled to equitable tolling. *Holland v. Florida*, 560 U.S. __, __ S.Ct. ___, 2010 WL

2346549, *12 (June 14, 2010);[2] *McClendon*, 329 F.3d at 492 ("Because th[e] statute of limitations [under 28 U.S.C. § 2244(d)(1)] is not jurisdictional, . . . state prisoners who fail to file timely petitions may still file federal habeas corpus petitions if the prisoners can show that they are entitled to an equitable tolling of the statute of limitations."). Turner argues that he is entitled to equitable tolling because he has made a credible showing of actual innocence. *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (citing *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995)). We have stated, generally, that equitable tolling "should only be granted sparingly," *Id.* (quoting *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002)), and the Supreme Court has stated that the actual innocence exception should "remain rare," being applied only in the "extraordinary case." *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (internal quotation marks omitted).

The actual innocence exception allows for equitable tolling if the petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." *Id.* at 316. If "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," the petitioner may "pass through the gateway and argue the merits of his underlying claims." *Id.* at 327. In order to raise a credible claim of actual, *factual*, innocence, Turner must provide "new reliable evidence . . . that was not presented at trial." *Souter*, 395 F.3d at 591.

---

[2]Because of the factual background of the case before it, the *Holland* Court did not directly address the requirements for equitable tolling in the context of an actual innocence claim. However, it did reaffirm that "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at ___, __ S.Ct. at ___, 2010 WL 2346549, *12. We therefore hold that Turner bears the burden of proof in showing that he is entitled to equitable tolling.

Because *Souter* was the first such "extraordinary case," out of many petitions that had attempted to show the need for equitable tolling, *id.* at 589, it will be helpful to examine the level of evidence required. In *Souter*, only one piece of evidence, a pint-sized bottle which Souter admitted to having the night of the murder, linked him to the victim's death. *Id.* at 581, 590. The testimony of three experts linked Souter to the victim. *Id.* at 590. One, the medical examiner, testified at trial that the bottle was the cause of the victim's wounds, but later stated that he was only speculating about the cause. *Id.* The second was a forensic pathologist who testified at trial that the wounds were caused by the bottle, but later completely recanted that testimony and stated that it was unlikely that the bottle was the murder weapon. *Id.* at 591. The third testified that the bottle would have had a sharp edge which would have matched the victim's wounds, but other evidence showed that the particular type of bottle would likely not have had a sharp edge. *Id.* Souter also provided photographic evidence that directly contradicted other trial testimony. *Id.* The panel found that the evidence, taken as a whole, was both new and sufficiently credible to require equitable tolling. *Id.* at 597.

In sharp contrast to the strong evidence of innocence that existed in *Souter*, Turner brings very little credible evidence of innocence to his petition. His "new reliable evidence" consists solely of several affidavits: (1) his own affidavit, asserting that Brenda Matthews, a friend, would testify that he was with her from 11:00 p.m. to midnight on the night of the fire; (2) an affidavit from Keith Campbell, a friend, stating that acquitted co-defendant Dyrone Turner had admitted his own guilt and Turner's innocence; (3) an affidavit from co-defendant Mark Smith, admitting his own guilt and attesting to Turner's innocence; (4) an affidavit from Luthair Baldwin, a friend, stating that witness

Ronald Arnold admitted lying when he testified regarding Turner; and (5) an affidavit from Michael Arnold, who attests that he called a friend's house sometime on the night of the fire and Turner answered the phone, which Turner presumably views as evidence establishing an alibi.

Turner argues that we are "ill equipped to consider" the fact-intensive question of equitable tolling, and requests that we remand for an evidentiary hearing. *First City Bank v. Nat'l Credit Union Admin. Bd.*, 111 F.3d 433, 439 (6th Cir. 1997) (remanding case for determination of whether statute of limitations barred plaintiff's claims). Unlike the circumstances faced by the panel in *First City*, however, the district court in this case made substantial factual findings regarding Turner's claims of actual innocence. Turner also argues that the district court was applying a different legal standard from that which we must apply in determining whether to apply equitable tolling. However, we find that the district court adequately reviewed the "new evidence" in light of the factual record in this case, and that the record is therefore sufficiently developed for us to determine whether the evidence offered by Turner is sufficient to show that he is entitled to equitable tolling.

In order to determine whether it is "more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *Souter*, 395 F.3d at 596 (brackets in original), we must consider Turner's new evidence in the context of all the evidence presented at trial.

The deaths for which Turner was convicted occurred as the result of a fire in a residence at 6305 Linwood (the "Residence") on June 18, 1992. Two days prior to the fire, Turner, co-defendant Mark Smith ("Smith"),[3] and another individual threatened those living at the Residence if they didn't let Turner sell drugs from the Residence. When the residents refused, Turner and his companions

---

[3]Smith was also convicted of two counts of second-degree murder and one count of felony firearm.

brandished firearms and began shooting (the "First Shooting"). Ronald Arnold ("Ronald")[4] lived in the neighborhood and heard the gunshots. Shortly thereafter, he saw Turner with a pistol. The next day, one day prior to the fire, Ronald overheard Turner admit that he had been involved in the First Shooting because those at the Residence refused to move. On the day of the fire, Ronald saw Turner, Smith, and another co-defendant, Dyrone Turner ("Dyrone"),[5] at Turner's grandmother's house with beer bottles containing what Ronald testified appeared to be gasoline.[6] Ronald testified that he heard Turner say that those at the Residence had to move, and that Dyrone suggested that they could burn them out. That same day, an individual who lived at the Residence, Jerome Young ("Young") saw Dyrone showing off a gun.[7]

Sometime between 10:00 p.m. and 10:30 p.m. on the night of June 18, 1992, Young, who sold drugs from the Residence, heard a horn outside and went to see if a prospective customer had arrived. He saw three men in a car, one of whom threw something that looked like a Molotov cocktail into the now-open doorway. A fire began at that doorway[8] and, within minutes, shooting began at the only other doorway to the Residence. Young looked out a partially-obstructed second story window and saw Turner, Smith, Dyrone, and a fourth unidentified individual firing their guns

---

[4]Ronald did not relate his story to police until after he was arrested on drug charges two months later, in August 1992, at which time he told police what he knew about the fire. In return for his assistance, the drug charge against Ronald was reduced and he received a lifetime of probation.

[5]Dyrone was acquitted of all charges.

[6]Police later found empty gasoline containers at Smith's residence, along with ammunition.

[7]Young was one of the witnesses who testified as to the June 16 shooting.

[8]The evidence at trial established that the fire was caused by a liquid accelerant, and an abundance of glass was found at the Residence, but there was no conclusive evidence of a bottle or wick.

at the second entrance.[9] Young has only one eye, wears glasses, and had smoked cocaine a half-hour before the fire began, but he positively identified the three co-defendants, and stated that they were wearing dark, hooded sweatshirts at the time of the shooting. Resident Bobby Smith testified that someone threw firebombs into the Residence and that he heard gunshots at the other entrance, but he did not see who threw the firebombs or who was shooting. With one door blocked by fire and another by gunfire, those living at the Residence had to find other ways to escape. Two failed to do so and died in the fire of soot and smoke inhalation.

Ronald testified that he received a phone call notifying him of the fire, and he went to investigate. On his way to the Residence, he heard gunshots. Ten minutes later, he saw Turner, Smith, and two other men running away from the Residence towards Turners' grandmother's house. Ronald testified that they were wearing dark, hooded sweatshirts. Slightly more than a week later, Ronald overheard Turner admit he had been involved in the fire because those who lived there refused to move. Ronald also overheard Turner take credit for making the firebombs that were used.

At trial, Smith presented one witness who claimed Smith was with her, at her home, from 11:00 p.m. to 3:00 a.m. on the night of the fire. Dyrone also presented one witness, Frederick Washington ("Washington"), who testified that he was at Ronald's house on the night of the fire. Washington testified that he went with Ronald to see the fire, but that he did not hear gunshots and did not see anyone running away from the fire. Turner presented no witnesses at trial, verbally assenting to the waiver of a single alibi witness and declining to testify himself.

---

[9]No shell casings were ever recovered.

In his briefs and at oral argument, Turner repeatedly categorized the preceding evidence as weak and argued that the State's case rested on the eye-witness of testimony of a "coked-up, one-eyed drug dealer" and a "rogue's gallery of criminals, drug users, and drug dealers." While his description of Young, the State's primary eye-witness, is perhaps more colorful than necessary, Turner is correct that he has only one eye, is nearsighted (although it is undisputed that he was wearing his glasses the night of the fire), and had used cocaine approximately 30 minutes prior to the fire. And it is true that—as is often the case in criminal prosecutions—most of the State's witnesses had led less than exemplary lives. However, Turner has never argued that his counsel, or counsel for his co-defendants, failed adequately to impeach the State's witnesses. The jury was also presented with evidence of the disreputable natures of Turner and his co-defendants. Taken as a whole, we cannot conclude that the evidence against Turner was weak, as Turner alleges.

Considered in the light of the remaining evidence against him, the additional evidence offered by Turner is insufficient to cause us to lose all confidence in the outcome of the trial. Turner's assertions regarding Ms. Matthews' supposed alibi testimony are troublesome for a number of reasons, not the least of which is the fact that Turner expressly waived his right to have Ms. Matthews testify. Ms. Matthews' supposed alibi testimony is also suspect because Turner has not produced an affidavit from Ms. Matthews herself indicating that she would be willing to testify on Turner's behalf, even though he claims to have known for over 17 years about her willingness to testify. Finally, it is not clear that Ms. Matthews' testimony, even if offered precisely as described by Turner, would be at all useful in establishing factual innocence. Turner argues that Ms. Matthews would testify that she was with him at a friend's house starting at 11:00 p.m., but the record indicates

that the fire began sometime between 10:00 p.m. and 10:30 p.m. The record does not indicate the time required to travel from the Residence to the friend's house, but up to one hour may have passed between the fire and the beginning of the time period for which Ms. Matthews might provide an alibi. This new evidence provides almost no support for Turner's claim of actual innocence.

The affidavit from Mike Arnold suffers from many of the same problems as Turner's claims regarding Ms. Matthews' testimony. Mr. Arnold attests that he heard gunfire on the night of June 18, 1992, later found out about the fire and went to see the fire, and only then telephoned the friend's house and heard Turner on the other end of the line. Even if judged fully credible, Mr. Arnold's testimony establishes only that Turner was at the friend's house at some point on the night of the fire. Mr. Arnold's affidavit, therefore, provides little to no support for Turner's claim of actual innocence.

The remaining affidavits also offer only weak support for Turner's claims. Mr. Campbell's affidavit purports to show that Dyrone has admitted guilt and absolved Turner, yet Dyrone, who has been acquitted on all charges, has never admitted guilt in his own sworn affidavit. Mr. Baldwin's affidavit also purports to absolve Turner of guilt by claiming that Ronald admitted to fabricating his testimony in order to obtain a deal on his own criminal charges, yet Ronald has never recanted his testimony in a sworn affidavit. The affidavits of Mr. Campbell and Mr. Baldwin also suffer from being replete with inadmissible hearsay. Finally, Smith's affidavit also admits guilt and absolves Turner of all guilt, yet that testimony directly contradicts Smith's testimony at trial, where he asserted his innocence. As noted by the district court, a reasonable juror would find it difficult to find Smith's affidavit credible because either he is lying now or he was lying then.

13

None of the affidavits submitted by Turner provides reliable support for his assertion of actual innocence, nor are they sufficient, cumulatively, to show that Turner is entitled to equitable tolling. Turner argues, however, that we should remand for an evidentiary hearing in order to allow him to further develop the record in support of his claim of actual innocence. The district court considered and denied Turner's motion for evidentiary hearing, a decision that we typically review for abuse of discretion. *Sawyer v. Hofbauer*, 299 F.3d 605, 610 (6th Cir. 2002). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Federal courts must take AEDPA standards into account in determining whether an evidentiary hearing is appropriate. *Id.* (citing *Mayes v. Gibson*, 210 F.3d 1284, 1287-88 (10th Cir. 2000) ("Whether [the petitioner's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]")).

As set forth above, our analysis of the AEDPA standards, as applied to this case, leads us to conclude that Turner is not entitled to habeas relief because he failed to file his habeas petition within the one-year period of limitations and because he is not entitled to equitable tolling. Even Turner's request for an evidentiary hearing on his actual innocence claims must be denied because "the record refutes [Turner's] factual allegations or otherwise precludes . . . relief." *Id.* Neither the existing record nor the additional affidavits submitted by Turner are sufficient to cast any significant doubt on the guilty verdict rendered by the state court, and the district court was not required to hold an evidentiary hearing on such insubstantial factual allegations. *Id.* at 475.

14

## CONCLUSION

Accordingly, and for the foregoing reasons, we **AFFIRM** the judgment of the district court.